## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUC VANCAMPENHOUT, Derivatively on Behalf of READY CAPITAL CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>THOMAS E. CAPASSE, JACK JAY ROSS, MEREDITH MARSHALL, DOMINIQUE MIELLE, GILBERT NATHAN, J. MITCHELL REESE, TODD M. SINAI, and ANDREW AHLBORN,<br><br>Defendants,<br><br>and,<br><br>READY CAPITAL CORPORATION,<br><br>Nominal Defendant. | Case No:    1:25-cv-2930<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Luc Vancampenhout ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Ready Capital Corporation. ("Ready Capital" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

### <u>NATURE OF THE ACTION</u>

1.    This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual

Defendants' (defined below) violations of state and federal law and have caused substantial harm to the Company.

2.      Ready Capital is a real estate finance company which originates, acquires, finances, and services lower-to-middle-market ("LLM") commercial real estate ("CRE") loans, small business administration loans, residential mortgage loans, and other real estate-related investments.

3.      The Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors: (i) that significant non-performing loans in its CRE portfolio were not likely to be collectible; (ii) that Ready Capital would fully reserve these problem loans in order to "stabilize" its CRE portfolio; (iii) that this was not accurately reflected in Ready Capital's current expected credit loss or valuation allowances; (iv) that, as a result, the Company's financial results would be adversely affected; and (v) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      On March 3, 2025, before the market opened, the Company announced its fourth quarter and full year 2024 financial results, reporting fourth quarter 2024 net loss of $1.80 per share and full year 2024 net loss of $2.52 per share.  The Company explained had to take ***"decisive actions to stabilize" its "balance sheet*** going forward by ***fully reserving for all of our nonperforming loans in our CRE portfolio."***  This included, among other actions, taking $284 million in combined Current Expected Credit Loss ("CECL") and valuation allowances in order to mark the Company's non-performing loans to current values. The Company further revealed that its total leverage increased to "3.8x," up from the prior quarter's total leverage of "3.3x."

5.     On this news, Ready Capital's stock price fell $1.86, or 26.8%, to close at $5.07 per share on March 3, 2025.

**JURISDICTION**

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this Court because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

9.      Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

10.     **_Nominal Defendant Ready Capital_** is a Maryland corporation with its principal executive offices located at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020.

### Director Defendants

11.     **_Defendant Thomas E. Capasse_** ("Capasse") has served as Chairman of the Board and Chief Executive Officer ("CEO") of the Company since October 2016 and as Chief Investment Officer of the Company since November 2022.  Defendant Capasse is also a co-founder and a manager of Waterfall Asset Management, LLC ("Waterfall"), the Company's external manager and advisor.

12.     **_Defendant Jack Jay Ross_** ("Ross") has served as President and a director of the Company since October 2016.  Defendant Ross is also a co-founder and a manager of Waterfall. Defendant Ross is also a co-founder and a manager of Waterfall.

13.     **_Defendant Meredith Marshall._** ("Marshall") has served as a director of the Company since December 2022. Marshall also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee.

14.     **_Defendant Dominique Mielle_** ("Mielle") has served as a director of the Company since March 2021. Defendant Mielle also serves as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee.

15.     **_Defendant Gilbert Nathan_** ("Nathan") has served as a director of the Company since March 2019.  Defendant Nathan also serves as a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.

16.     **_Defendant J. Mitchell Reese_** ("Reese") has served as a director of the Company since October 2016.  Defendant Reese also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee.

17.     **_Defendant Todd M. Sinai_** ("Sinai") has served as a director of the Company since October 2016.  Defendant Sinai also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating and Corporate Governance Committee.

18.     Defendants Capasse, Ross, Marshall, Mielle, Nathan, Reese, and Sinai are sometimes referred to herein collectively as the "Director Defendants."

**Officer Defendant**

19.     **_Defendant Andrew Ahlborn_** ("Ahlborn") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Defendant Ahlborn also joined Waterfall in 2010.

20.     Defendant Ahlborn along with Defendants Capasse and Ross are collectively referred to herein as the "Officer Defendants."

21.     The Director Defendants and Defendant Ahlborn are collectively referred to herein as the "Individual Defendants."

**BACKGROUND**

22.     Ready Capital is a real estate finance company which originates, acquires, finances, and services lower-to-middle-market commercial real estate loans, small business administration loans, residential mortgage loans, and other real estate-related investments.

23.     In the fourth quarter of 2023, the Company's Board approved a plan to strategically shift the Company's core focus to LMM CRE loans and government backed small business loans. The Company originates LMM loans across the full life-cycle of an LMM property including construction, bridge, stabilized and agency loan origination channels through its wholly-owned subsidiary, ReadyCap Commercial.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

24.     On November 7, 2024, the Individual Defendants caused the Company to issue a press release reporting its financial results for the quarter ended September 30, 2024.  The press release touted the Company's third quarter highlights, and financial results, including its purported "net book value of $12.59 per share," as well as its Current Expected Credit Loss ("CECL") reserve and valuation allowance activity.  The press release stated as follows:

**Third Quarter Highlights**

- Lower-to-Middle Market originations of $246 million

- Record Small Business Lending loan originations of $440 million, including $355 million of Small Business Administration 7(a) loans

- *Net book of $12.59 per share* of common stock as of September 30, 2024

- Declared and paid dividend of $0.25 per share

- Strengthened the Small Business Lending platform with the acquisition of Funding Circle USA, Inc.

*          *          *

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings

| (in thousands) | Three Months Ended September 30, 2024 | |
|---|---|---|
| Net Loss | $ | (7,279) |
| Reconciling items: | | |
| Unrealized loss on joint ventures | | 2,173 |
| Increase in CECL reserve | | 52,442 |
| Decrease in valuation allowance | | (71,060) |
| Non-recurring REO impairment | | 525 |
| Non-cash compensation | | 1,916 |
| Merger transaction costs and other non-recurring expenses | | 4,070 |
| Bargain purchase gain | | (32,165) |
| Realized losses on sale of investments | | 109,675 |
| Total reconciling items | $ | 67,576 |
| Income tax adjustments | | (13,739) |
| Distributable earnings before realized losses | $ | 46,558 |
| Realized losses on sale of investments, net of tax | | (89,072) |
| Distributable earnings | $ | (42,514) |
| Less: Distributable earnings attributable to non-controlling interests | | 1,766 |
| Less: Income attributable to participating shares | | 2,241 |
| Distributable earnings attributable to common stockholders | $ | (46,521) |
| Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted | $ | 0.25 |
| Distributable earnings per common share - basic and diluted | $ | (0.28) |

25.     On the same day, November 7, 2024, the Company published supplemental financial information related to its financial results for the quarter ended September 30, 2024. The supplemental financial data promoted the Company's purported financial results, including the Company's alleged net book value of $12.59 and "total leverage of 3.3x and recourse leverage ratio of 1.0x."

26.     On November 8, 2024, the Company held an earnings call related to its third quarter 2024 financial results. During the earnings call, Defendant Capasse offered prepared remarks in which he stated the Company's "CRE portfolio is showing stabilizing credit metrics." Defendant Capasse also stated that the "growing earnings contribution" of the Company's Small Business Lending segment "along with normalization of our CRE business to historical levels should support a longer-term ROE premium to our peer group." Defendant Capasse concluded that "Ready Capital is well positioned to capitalize on the tailwinds in the CRE market" naming its

"stabilizing CRE platform" as among the "key drivers" of the Company's earnings growth. Defendant Capasse further stated the Company's "leverage position remains conservative" with a "total leverage of 3.3 times is below [the Company's] long-term target of four times." During the question-and-answer portion of the earnings call, Defendant Capasse was asked by an analyst to clarify if the Company was "through the worst of the commercial real-estate cycle for Ready Capital?" to which Capasse responded:

> *Yes,* we're definitively seeing as evidenced by Adam's comments in terms of the kind of sawtooth down in the absolute dollar delinquencies, and what we're seeing in terms of the migration of the four or five assets as it relates to the originated portfolio, it definitely is mirroring the what you're seeing in terms of the macro data in the multi-family sector. [Emphasis added].

27.    On November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024, on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "3Q24 10-Q"). The 3Q24 10-Q purported to describe the Company's LMM CRE Segment Results as follows:

> *LMM Commercial Real Estate Segment Results.*
>
> *Q3 2024 versus Q3 2023.* Interest income of $193.3 million represented a decrease of $26.2 million, primarily due to decreased loan balances, partially offset by increases in interest rates. Interest expense of $150.5 million represented a decrease of $18.5 million, driven by decreased debt balances, partially offset by increases in interest rates. Provision for loan losses of $49.2 million represented an increase of $63.7 million, primarily due to an increase in asset specific reserves. Non-interest loss of $19.1 million represented an increase of $50.5 million, primarily due to net realized losses on financial instruments and real estate owned, partially offset by a decrease in the valuation allowance related to the transfer of Loans, net to Loans, held for sale in the first half of 2024. Non-interest expense of $21.1 million represented a decrease of $8.6 million, due to a decrease in employee compensation and benefits and loan servicing expenses.

28.    The 3Q24 10-Q also contained Management's Discussion and Analysis of Financial Condition and Results of Operations which reported the Company's "critical accounting

estimates" and alleged that the Company's "allowance for credit losses" "are reviewed quarterly considering credit quality indicators."  The 3Q24 10-Q stated:

> **Critical Accounting Estimates** Our consolidated financial statements are prepared in accordance with GAAP, which requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. We believe that all of the decisions and assessments upon which our consolidated financial statements are based were reasonable at the time made, based upon information available to us at that time. The following discussion describes the critical accounting estimates that apply to our operations and require complex management judgment. This summary should be read in conjunction with our accounting policies and use of estimates included in "Notes to Consolidated Financial Statements, Note 3 – Summary of Significant Accounting Policies" included in Item 8, "Financial Statements and Supplementary Data," in the Company's Form 10-K.

> **_Allowance for credit losses_ The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratio and economic conditions.** The allowance for credit losses increases through provisions charged to earnings and reduced by charge-offs, net of recoveries.

> We utilize loan loss forecasting models for estimating expected life-time credit losses, at the individual loan level, for its loan portfolio. The Current Expected Credit Loss ("CECL") forecasting methods used by the Company include (i) a probability of default and loss given default method using underlying third-party CMBS/CRE loan database with historical loan losses and (ii) probability weighted expected cash flow method, depending on the type of loan and the availability of relevant historical market loan loss data. We might use other acceptable alternative approaches in the future depending on, among other factors, the type of loan, underlying collateral, and availability of relevant historical market loan loss data.

> We estimate the CECL expected credit losses for our loan portfolio at the individual loan level. Significant inputs to our forecasting methods include (i) key loan-specific inputs such as LTV, vintage year, loan-term, underlying property type, occupancy, geographic location, and others, and (ii) a macro-economic forecast. These estimates may change in future periods based on available future macroeconomic data and might result in a material change in our future estimates of expected credit losses for its loan portfolio.  [Emphasis added].

29.    On November 25, 2024, the Company published its November 2024 investor presentation.  The investor presentation promoted the Company's strong market position due to its LMM CRE portfolio, as well as its "[c]onservative approach to credit" with only "< 5bps losses incurred on new originations since the company's start."   The investor presentation further promoted the Company's "financial flexibility" including its "total leverage of 3.3x."

30.    The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. The Individual Defendants failed to disclose to investors: (i) that significant nonperforming loans in its CRE portfolio were not likely to be collectible; (ii) that the Company would fully reserve these problem loans in order to "stabilize" its CRE portfolio; (iii) that this was not accurately reflected in the Company's current expected credit loss or valuation allowances; (iv) that, as a result, the Company's financial results would be adversely affected; and (v) that, as a result of the foregoing, Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

31.    On March 3, 2025, before the market opened, the Company issued a press release announcing its fourth quarter and full year 2024 financial results, reporting fourth quarter 2024 net loss of $1.80 per share and full year 2024 net loss of $2.52 per share.  The press release explained the Company had to take "decisive actions to stabilize" its "balance sheet going forward by fully reserving for all of our non-performing loans in our CRE portfolio."   This included taking approximately $382 million in reconciling items, including $284 million in combined CECL and valuation allowances, in order to mark the Company's non-performing loans to current values.

This action significantly reduced the Company's book value per share to $10.61 compared to the prior quarter's $12.59.  The press release stated:

### READY CAPITAL CORPORATION REPORTS FOURTH QUARTER 2024 RESULTS AND DECLARES FIRST QUARTER 2025 DIVIDENDS

GAAP LOSS PER COMMON SHARE FROM CONTINUING OPERATIONS OF $(1.80)

DISTRIBUTABLE LOSS PER COMMON SHARE OF $(0.03)

DISTRIBUTABLE EARNINGS PER COMMON SHARE BEFORE REALIZED LOSSES OF $0.23

DISTRIBUTABLE RETURN ON AVERAGE STOCKHOLDERS' EQUITY BEFORE REALIZED LOSSES OF 7.1%

DECLARED A QUARTERLY CASH DIVIDEND OF $0.125 PER SHARE OF

COMMON STOCK AND OPERATING PARTNERSHIP UNIT FOR THE QUARTER ENDING MARCH 31, 2025

New York, New York, March 3, 2025 / Globe Newswire / – Ready Capital Corporation ("Ready Capital" or the "Company") (NYSE: RC), a multi-strategy real estate finance company that originates, acquires, finances, and services lower-to-middle-market ("LMM") investor and owner-occupied commercial real estate loans, today reported financial results for the quarter ended December 31, 2024 and declared dividends for the quarter ending March 31, 2025.

"The fourth quarter closes out a year of mixed results. On one hand, our Small Business Lending segment performed well, with significant origination growth reflecting the benefits of past investments. Meanwhile, our multi-family lending focused business faced challenges from higher rates, inflationary pressures, and lower rent growth," said Thomas Capasse, Ready Capital's Chairman and Chief Executive Officer. ***"Entering 2025, we have taken decisive actions to stabilize and better position our balance sheet going forward by fully reserving for all of our non-performing loans in our CRE portfolio.*** While this reduces our book value per share in the short term, we believe it provides a path to recovery in our net interest margin through the accelerated resolution of our non-performing loans to generate liquidity for reinvestment in higher-yielding new originations. Additionally, we have adjusted our dividend to $0.125 per share to align anticipated cash earnings to preserve capital for reinvestment and share repurchases with potential upward bias co-incident with the recovery in earnings. We believe these actions will enable the Company to resume growth in both book value per share and the dividend as we move forward."

**Fourth Quarter Highlights**

- LMM commercial real estate originations of $436 million

- Small Business Lending ("SBL") loan originations of $348 million, including $315 million of Small Business Administration 7(a) loans

- Book value of $10.61 per share of common stock as of December 31, 2024

- Entered into a definitive merger agreement to acquire United Development Funding IV, a real estate investment trust providing capital solutions to residential real estate developers and regional homebuilders

- Acquired approximately 5.8 million shares of the Company's common stock at an average price of $7.35 per share as part of stock repurchase program

- Issued $130 million in aggregate principal amount of 9.00% Senior Unsecured Notes due 2029

**Full Year Highlights**

- ***GAAP Loss per common share from continuing operations of $(2.52)***

- Distributable earnings per common share before realized losses of $0.97

- Distributable return on average stockholders' equity before realized losses of 7.5%

- Total LMM and SBL originations of $2.4 billion, including $1.1 billion of Small Business Administration 7(a) loans

- Sold $7.6 billion in mortgage servicing rights in connection with the disposition of its residential mortgage banking segment

- Completed the acquisitions of Madison One, a leading originator and servicer of USDA and SBA guaranteed loan product, and Funding Circle USA, Inc., an online lending platform that originates and services small business loans

- Acquired approximately 10.3 million shares of the Company's Common stock at an average price of $7.95 per share as part of stock repurchase program.  [Emphasis added].

32.     On the same date, March 3, 2025, the Company held an earnings call in connection with the foregoing financial results.  During the earnings call, Defendant Capasse stated that the Company has "undertaken … aggressive actions to reset the balance sheet and go-forward earnings

profile," including "a $284 million combined CECL and valuation allowances, which marks 100% of our non-performing loans to current values."

33.     On this news, the Company's stock price fell $1.86, or 26.8%, to close at $5.07 per share on March 3, 2025.

## THE COMPANY'S STOCK REPURCHASES

34.     The Individual Defendants, while issuing false and misleading statements to the market, caused the Company to initiate repurchases of its common stock in December 2024 that substantially damaged the Company. According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase 5,843,463 shares of its own stock, for a total of approximately $42.9 million.

35.     Given that the price of Ready Capital stock was $5.07 per share on March 3, 2025, after the corrective disclosures, the true value of the 5,843,463 repurchased shares was roughly $29,626,357. Accordingly, the Individual Defendants caused the Company to overpay by approximately $13,323,096 to repurchase these shares.

36.     These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company.  As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

### Securities Class Action

37.     On March 6, 2025, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company and Defendants Capasse

and Ahlborn. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Quinn v. Ready Capital Corp., et al.*, Case No. 1:25-cv-01883 (S.D.N.Y.) (the "Securities Class Action").

38.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

39.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

40.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

41.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

42.     As detailed above, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock by over $13.3 million.

**Additional Damage to the Company**

43.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

44.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

45.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

46.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

47.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Ethics**

48.     At all relevant times, the Company had in place its Code of Ethics which applies to

"all officers, directors and employees of the Company" (*i.e.*, "Covered Persons" under the Code

of Ethics).  The Code of Ethics states:

- Place the Company's interests ahead of their own – Covered Persons must serve in the Company's best interests and avoid inappropriately benefiting at the expense of the Company.

- Engage in personal investing that is in full compliance with the Company's Code of Ethics – Covered Persons must review and abide by the Company's Personal Security Transaction Policy contained herein.

- Avoid taking advantage of your position – Covered Persons must not accept investment opportunities, gifts or other gratuities from individuals seeking to conduct business with the Company or Waterfall, or on behalf of an advisory client of Waterfall, unless in compliance with the Gifts and Entertainment Policy contained herein.

- Maintain full compliance with the Federal Securities Laws – Covered Persons must abide by the standards set forth in Rule 204A-1 under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), the Investment Company Act of 1940, as amended (the "Investment Company Act"), and other Federal Securities Laws, as pertinent.

49.     In a section entitled "Compliance with Applicable Laws," the Code of Ethics states:

The Company is committed to conducting its business in strict compliance with all applicable governmental, state and local laws, rules and regulations, including, laws, rules and regulations related to securities, labor, employment and workplace safety matters.  As a public reporting company with its stock trading on the New York Stock Exchange (the "NYSE"), the Company is also subject to regulation by the SEC and to the applicable listing standards of the NYSE.  All Covered Persons are expected at all times to conduct their activities on behalf of the Company in accordance with this principle.  Any violation of applicable laws, rules and regulations by any Covered Person should be reported to the Chief Compliance Officer.  Covered Persons should seek guidance whenever they are in doubt as to the applicability of any law, rule or regulation or regarding any contemplated course of action.

50.     In a section entitled "Guiding Principles & Standards of Conduct," the Code of

Ethics states:

All Covered Persons will act with competence, dignity and integrity, in an ethical manner, when dealing with the public, prospects, third-party service providers and each other. The following set of principles frame the professional and ethical conduct that the Company expects from its Covered Persons:

- Act with integrity, competence, diligence, respect, and in an ethical manner with the public, service providers, third parties and other Covered Persons;

- Place the integrity of the Company and the interests of the Company above one's own personal interests;

- Adhere to the fundamental standard that you should not take inappropriate advantage of your position;

- Avoid any actual or potential material conflict of interest;

- Conduct all personal securities transactions in a manner consistent with this policy;

- Use reasonable care and exercise independent professional judgment when conducting investment analysis, making investment recommendations, taking investment actions, and engaging in other professional activities;

- Practice and encourage others to practice in a professional and ethical manner that will reflect favorably on you and the profession;

- Promote the integrity of, and uphold the rules governing, the Company's business;

- Maintain and improve your professional competence and strive to maintain and improve the competence of other investment professionals.

- Comply with applicable provisions of the U.S. securities laws.

The Company considers it be a violation of this Code of Ethics for any Covered Person, directly or indirectly, to:

- Employ any devise, scheme or artifice to defraud the Company;

- Make any untrue statement of a material fact to the Company or omit to state a material fact necessary in order to make the statements made to the Company, in light of the circumstances under which they are made, not misleading;

- Engage in any act, practice or course of business that operates or would operate as a fraud or deceit on the Company; or

- Engage in any manipulative practice with respect to the Company.

51.     In a section entitled "Protection of the Company's Name," the Code of Ethics states:

> Covered Persons should at all times be aware that the Company's name, reputation and credibility are valuable assets and must be safeguarded from any potential misuse.  Care should be exercised to avoid the unauthorized use of the Company's name in any manner that could be misinterpreted to indicate a relationship between the Company and any other entity or activity.

52.     In a section entitled "Accounting Matters," the Code of Ethics provides the following:

*Internal Accounting Controls*

> The Company places the highest priority on "best practices" disclosure.  The Company's annual reports, quarterly reports and press releases, and other public disclosure of the Company's financial results, reflect how seriously it takes this responsibility.

> Covered Persons share this responsibility with Waterfall and the Board and must help maintain the integrity of the Company's financial records.  The Company trusts that Covered Persons understand that protecting the integrity of its information gathering, information quality, internal control systems and public disclosures is one of the highest priorities it has as a firm.

> Any Covered Persons who observes conduct that causes them to question the integrity of the Company's internal accounting controls and/or disclosure, or if they otherwise have reason to doubt the accuracy of Company's financial reporting, it is imperative that such concerns are brought to the Company's attention immediately. In accordance with the Company's "Whistleblowing Procedures for Accounting and Auditing Matters" policy, Covered Persons should promptly report any concerns to any member of the Audit Committee of the Board.  If any Covered Person is not comfortable providing their name, they may report anonymously. Any kind of retaliation against Covered Persons for raising these issues is strictly prohibited and will not be tolerated.

*Improper Influence on the Conduct of Audits*

> It is unlawful for Covered Persons, or any other person acting under the direction of any such persons, to take any action to fraudulently influence, coerce, manipulate, or mislead the independent accountants engaged in the performance of

18

an audit of the Company's financial statements for the purpose of rendering such financial statements materially misleading. Any such action is a violation of the Company's Code of Ethics. Any Covered Persons who engages in such conduct will be subject to sanctions under this Code of Ethics, in addition to potential civil and criminal liability.

53.     In a section entitled "Public Disclosure," the Code of Ethics states:

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf. In meeting such standards for disclosure, the Company's officers and directors shall at all times strive to comply with the Company's disclosure obligations and, as necessary, appropriately consider and balance the need or desirability for confidentiality with respect to non-public negotiations or other business developments.

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing effective disclosure controls and procedures and internal control over financial reporting within the meaning of applicable SEC rules and regulations. The Company expects the Chief Executive Officer and the Chief Financial Officer to take a leadership role in implementing such controls and procedures and to position the Company to comply fully with its disclosure obligations within the timeframe required under applicable SEC rules and regulations. No Covered Person should interfere with, hinder or obstruct the Company's efforts to meeting the standards for public disclosure set forth above.

The Company's Chief Executive Officer and Chief Financial Officer are the Company's principal spokespersons. If someone outside the Company asks you questions or requests regarding the Company, its business or financial results, do not attempt to answer. All requests for information - from reporters, securities analysts, shareholders or the general public - should be referred to either of these spokespersons, who will handle the request or delegate it to an appropriate person.

54.     In a section entitled "Books and Records," the Code of Ethics provides:

The Company's responsibilities to its stockholders and the investing public require that all of the Company's books, records, accounts and financial statements be maintained in reasonable detail, appropriately reflect the Company's transactions and conform to applicable legal requirements, the Company's system of internal controls and accounting principles generally accepted in the United States ("GAAP"). The Company relies on the accuracy and completeness of its business records to (i) provide full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings

19

conference calls and industry conferences, made by the Company or on the Company's behalf, (ii) make management decisions and (iii) analyze its operations. The accuracy of such records is essential for continued, long-term business success.

No false, misleading or artificial entries may be made by any Covered Person in the books and records of the Company. All Covered Persons with supervisory responsibility shall establish and implement appropriate internal accounting controls over all areas of their responsibility to ensure the safeguarding of the Company's assets and the accuracy of its financial records and reports. The Company has adopted controls in accordance with internal needs and the requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All Covered Persons, within their areas of responsibility, are expected to adhere to these procedures, as directed by the Chief Financial Officer.

Any accounting adjustments that materially depart from GAAP must be approved by the Company's Chief Financial Officer. In addition, all material off-balance-sheet transactions, arrangements and obligations, contingent or otherwise, and other relationships of the Company with unconsolidated entities or other persons that may have material current or future effects on the financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses must be disclosed to the Company's Chief Financial Officer.

**Audit Committee Charter**

55.     At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee.  The Company's Audit Committee Charter states that the purpose of the Audit Committee is assist the Board in:

[F]ulfilling its responsibilities to the stockholders, potential stockholders and investment community relating to the corporate accounting and reporting practices of the Company and its subsidiaries, the quality and integrity of the Company's consolidated financial statements, the Company's compliance with applicable legal and regulatory requirements, the performance, qualifications and independence of the Company's external auditors, and the performance of the Company's internal audit function, controls and procedures.

56.     In a section titled "Responsibilities and Duties," the Audit Committee Charter states that the Audit Committee has the following responsibilities and duties, among others:

**A.      Financial and Related Reporting**

1.     Prior to the filing by the Company of a Quarterly Report on Form 10-Q (the "Form 10-Q"), the Committee shall approve such filing. In connection therewith, the Committee shall review with the Company's management and external auditors, the interim financial information to be included in the Form 10-Q and the matters described in the applicable standards, as such standards may be adopted and amended from time to time, of the Public Company Accounting Oversight Board (the "PCAOB"). In addition, in connection with the Committee's review of the Form 10-Q when applicable, the Committee shall review any matters of significance, including significant adjustments, management judgments and accounting estimates, significant reserves and/or accruals, significant new accounting principles, disagreements between management and the external auditors and their effect, if any, on the Company's consolidated financial statements and recent or proposed applicable requirements of the SEC, the Financial Accounting Standards Board (the "FASB") or other similar governing bodies, and when applicable the disclosure set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-Q.

2.     The Committee shall, prior to each filing by the Company of an Annual Report on Form 10-K (the "Form 10-K") with the SEC, review with the Company's management and external auditors, and approve, the audited financial statements to be included in the Form 10-K and in the Company's annual report to stockholders (the "Annual Report") and review and consider the matters described in the applicable standards, as such standards may be adopted and amended from time to time, of the PCAOB. In connection therewith, the Committee shall review significant adjustments, management judgments and accounting estimates, significant reserves and/or accruals, significant new accounting principles, disagreements between management and the external auditors and their effect, if any, on the Company's consolidated financial statements and recent or proposed applicable requirements of the SEC, the FASB or other similar governing bodies, and the disclosure set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-K. Following such review, the Committee shall recommend to the Board whether the audited financial statements should be included in the Annual Report or the Form 10-K. Prior to the filing with the SEC of the Annual Report or the Form 10-K, the Board shall approve such filing.

3.     The Committee shall meet with the Company's Chief Executive Officer and/or any other officer of the Company responsible for certifying the Company's Form 10-K or Form 10-Qs filed with the SEC, prior to any such certification, and review with such officers their disclosures relating to (a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and the identification of any material

weakness in internal controls and (b) any fraud, whether or not material, that involves the Company's management or other employees who have a significant role relating to the Company's internal controls.

4.    In connection with its review of each Form 10-Q and Form 10-K and prior to issuance of any earnings press release by the Company, the Committee shall review with the Company's management and external auditors the consolidated statements of operations, earnings guidance and other financial information to be included in such earnings press release. Prior to issuance of any release of financial information or earnings guidance to analysts or rating agencies, the Committee shall review with the Company's management and external auditors the financial information or earnings guidance to be included in such release to be provided to analysts or rating agencies. Each member of the Committee shall have the opportunity to comment on such earnings press release, release of financial information or earnings guidance and/or arrange a conference call with the Company's management with respect to such release.

5.    The Committee shall annually issue a written report to the Board, a copy of which shall be included in the Company's proxy statement related to the annual meeting of stockholders, stating whether the Committee has (a) reviewed and discussed the audited financial statements with the Company's management, (b) discussed with the Company's external auditors the matters required to be discussed by the applicable standards adopted by the PCAOB, as such standards may be adopted and amended from time to time, (c) received from the Company's external auditors disclosures regarding such auditors' independence required by Independence Standards Board No. 1 and discussed with such auditors their independence, (d) recommended to the Board that the audited financial statements of the Company be included in the Annual Report and the Form 10-K and (e) such other information as may be required, from time to time, by the rules and/or regulations of the NYSE, the SEC, the FASB or other similar governing bodies.

6.    The Committee shall periodically discuss with the Company's external auditors, such auditors' judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its consolidated financial statements. The discussion should include such issues as the clarity of the Company's financial disclosures, the degree of aggressiveness or conservatism of the Company's accounting principles and the underlying estimates and other significant decisions made by the Company's management in preparing the financial disclosures.

7.    The Committee shall obtain and review, on an annual basis, a report prepared by the Company's management and/or external auditors setting forth all significant financial reporting issues and judgments made in

connection with the preparation of the Company's financial statements, including an analysis of the effects on the financial statements of the Company of any alternative generally accepted accounting principle ("GAAP") methods adopted by the Company, any regulatory and/or accounting initiatives and any off-balance sheet structures and all critical accounting policies and practices the Company uses or expects to use.

**B.      Controls and Compliance**

8.      The Committee shall periodically review with the Company's management and external auditors, and internal auditors of the Company or its Manager (a) the adequacy and effectiveness of the Company's system of internal accounting controls and procedures, (b) any recommendations of such external auditors and/or internal auditors of the Company or its Manager with respect to any material weaknesses in the Company's system of internal controls, (c) any material matters or problems with respect to accounting, records, procedures or operations of the Company which have not been resolved to such external and/or internal auditors' satisfaction after having been brought to the attention of management, (d) any material matters or problems with respect to the safeguarding of the Company's assets and limitations on authority of the Company's management relating to, among other things, investments, borrowings and derivative instruments, (e) any "management" or "internal control" letter issued, or proposed to be issued, by the Company's external auditors and all other material written communications between the external auditors and the management of the Company and (f) the work product for the testing of internal accounting controls and procedures. Such review should also consider the impact of the adequacy and effectiveness of the Company's system of internal accounting controls on the Company's financial reporting on both an annual and quarterly basis.

9.      The Committee shall discuss and review policies with respect to risk assessment and risk management, including, but not limited to, (a) guidelines and policies to govern the process by which risk assessment and risk management is undertaken by the Company and its management, (b) the adequacy of the Company's insurance coverage, (c) any uninsured or commercially uninsurable risks, (d) the Company's interest rate risk management, (e) the Company's counterparty and credit risks and (f) the Company's capital availability and refinancing risks.

10.     The Committee shall review with the Company's management and tax advisors the status of all tax returns, including open years and potential disputes. The Committee shall review with the Company's external auditors the adequacy of tax reserves included in the Company's consolidated financial statements.

11.     On at least an annual basis, the Committee shall review with legal counsel to the Company or its Manager, (a) any legal or regulatory matters that could have a significant impact on the Company's financial statements, (b) the Company's compliance with applicable laws and regulations and (c) inquiries received from regulators or governmental agencies.

12.     The Committee shall review the status of significant litigation with legal counsel to the Company or its Manager and external auditors, if appropriate, and whether reserves, if any, in connection with actual and/or potential litigation are appropriate.

13.     The Committee shall monitor and review the Company's compliance with any applicable SEC and NYSE rules and regulations relating to, among other things, the Company's corporate accounting and reporting practices, the quality and integrity of the Company's consolidated financial statements, the performance, qualifications and independence of the Company's external auditors and the performance of the Company's internal audit function.

## C.    Internal Audit

14.     To the extent applicable, the Committee shall review and approve the function of the internal audit department of the Company or its Manager, its staffing, compensation, budget, responsibilities, organization, activities, independence and authority of its reporting obligations, as well as the qualifications of its personnel. The Committee shall, on a regular basis, review the Company's internal audit charter, if any, and compliance by the Company's or the Manager's, as applicable, internal audit department with applicable standards of the Institute of Internal Auditors. The Committee shall also review the appointment, compensation and replacement of the Company's third-party internal auditors or, if applicable, senior internal auditing executive and the coordination of such activities with the Company's external auditors.

15.     The Company's third-party internal auditors, which may include the Manager, or, if applicable, the senior internal auditing executive shall report directly to the Committee. The Committee shall meet regularly, but in no event less than once every six months, with the internal auditors of the Company or its Manager in executive sessions without the Company's management present.

## D. External Audit

16.     The Committee shall engage and terminate (subject to, if applicable, stockholder ratification) the external auditors to be used to audit the consolidated financial statements of the Company.

17.    The Committee shall review and pre-approve the engagement fees and the terms of all auditing and non-auditing services to be provided by the Company's external auditors and evaluate the effect thereof on the independence of the external auditors. The Committee shall also review and evaluate the scope of all non-auditing services to be provided by the Company's external auditors in order to confirm that such services are permitted by any applicable rules and/or regulations of the NYSE, the SEC, FASB or other similar governing bodies. As necessary, the Committee shall consult with the Company's management regarding the engagement fees or terms of any such auditing or non-auditing services.

18.    The Committee shall, at least annually, evaluate the Company's external auditors' qualifications, performance and independence and present a written report to the Board of its conclusions with respect to such evaluation. In connection with this evaluation, the external auditors shall provide a written annual report to the Committee describing: (a) such external auditors' internal qualitycontrol procedures; (b) any material issues raised by the most recent internal quality-control review, or peer review, of such external auditors or by any inquiry or investigation by government or professional authorities within the preceding five years, respecting one or more independent audits carried out by such external auditors, and any steps taken to deal with any such issues; and (c) in order to assess such external auditors' independence, all relationships between such external auditors and the Company. The Committee shall consult with the Company's management, its external auditors and/or personnel responsible for its internal audit function, as necessary, regarding this evaluation.

19.    The Committee shall review and evaluate the qualifications, performance and independence of the lead partner of the external auditors, ensure that neither the lead partner nor the concurring partner of the external auditors serves, respectively, in that capacity for more than five years (or such other period as may be prescribed by rules and/or regulations of the NYSE, the SEC, the FASB or other similar governing bodies) and present its conclusions with respect to the independent auditors, including whether the audit firm itself should be changed periodically, to the Board.

20.    The Committee shall meet with the Company's management and external auditors prior to commencement of the annual audit by such external auditors for the purpose of reviewing the scope and audit procedures of such audit, including special audit risk areas and materiality. The Committee shall also meet with the Company's external auditors subsequent to completion of that audit for the purpose of reviewing the results.

21.    The Committee shall obtain and review any written reports issued by the Company's external auditors regarding all critical accounting policies and

practices the Company uses or expects to use, all alternative treatments of financial information within GAAP that have been discussed with the Company's management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the external auditors.

22.    The Committee shall meet regularly, but in no event less than once every six months, with the Company's external auditors in executive sessions without the Company's management present. Among the items to be discussed at these meetings are the auditors' evaluation of the Company's financial, accounting and the internal auditing personnel of the Company or its Manager, as applicable, and the cooperation that the auditors received during the course of the audit, including any audit problems or difficulties, together with the responses of the Company's management thereto, any restrictions on the scope of such external auditors' activities and any significant disagreements with the Company's management. If applicable, such review may also include any accounting adjustments that were noted or proposed by such auditors but were "passed" (including similar adjustments that were passed because individually they were not material), any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, any "management" or "internal control" letter issued, or proposed to be issued, by such auditors to the Company and all other material written communications between the external auditors and the management of the Company.

**E.    Other Committee Activities**

23.    The Committee shall report to the Board on a regular basis.

24.    The Committee shall serve as access for the Company's management, external auditors and internal auditors to the Board with respect to all matters within the scope of the Committee's duties. . . .

27.    The Committee shall conduct an annual evaluation of its own performance, including the performance of individual members, and confirm annually that all of the Committee's responsibilities set forth in this Charter have been performed.

28.    The Committee shall annually review and assess this Charter. This Charter may be amended by the recommendation of the Committee and the approval of the independent members of the Board. All amendments will be reported to the Board.

29.    Members of the Committee shall assist the Chairperson's review and consideration of any related-party transactions presented to the Chairperson

pursuant to the Company's related party transaction policies and procedures.

## DUTIES OF THE DIRECTOR DEFENDANTS

57.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

58.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

59.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

60.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

61.     To discharge their duties, the officers and directors of the Company were required

to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment

and not the result of outside influences or entrenchment motives.

62.     Each Director Defendant, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

63.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

65.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

66.     Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants'

wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

67.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

68.     The Company Board is currently comprised of seven (7) members – including Defendants Capasse, Ross, Marshall, Mielle, Nathan, Reese, Sinai (*i.e.*, the Director Defendants). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

69.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

70.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

71.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

72.     Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

73.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme and consciously disregarded their duties to protect corporate assets.

74.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

75.     Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

76.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

77.     Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

78.     Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**THE DIRECTOR DEFENDANTS ARE
NOT INDEPENDENT OR DISINTERESTED**

**Defendant Capasse**

79.     Defendant Capasse is not disinterested or independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Ready Capital, making him not independent, as admitted by the Company.  As such, Defendant Capasse cannot independently consider any demand to sue himself for breaching his fiduciary duties to Ready Capital, because that would expose him to liability and threaten his livelihood.

80.     As CEO, Defendant Capasse also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Capasse could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Capasse is therefore futile.

81.     As the Company's highest officer and influential member of the Board, Defendant Capasse was ultimately responsible for the issuance of all of the false and misleading statements, including the false and misleading statements in the Company's SEC filings, all of which he signed. In addition, Defendant Capasse personally made false and misleading statements, as alleged above, and thus faces a substantial likelihood of liability therefor.

82.     In addition, Defendant Capasse receives lucrative compensation in connection with his employment with the Company. Defendant Capasse is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Capasse. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Capasse could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

83.     Because of Defendant Capasse's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Capasse is unable to comply with his fiduciary duties and prosecute this action. Defendant Capasse is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

84.     Defendant Capasse is neither independent nor disinterested. Any demand upon Defendant Capasse is futile and, thus, excused.

**Defendant Ross**

85.     Defendant Ross is not disinterested or independent, and therefore, is incapable of

considering demand because he (as its president) is an employee of the Company who derives substantially all of his income from his employment with Ready Capital, making him not independent, as admitted by the Company. As such, Defendant Ross cannot independently consider any demand to sue himself for breaching his fiduciary duties to Ready Capital, because that would expose him to liability and threaten his livelihood.

86.    As president, Defendant Ross also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Ross could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Ross is therefore futile.

87.    In addition, Defendant Ross receives lucrative compensation in connection with his employment with the Company. Defendant Ross is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the president and Executive Officers, including Defendant Ross. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its president and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Ross could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

88.    Defendant Ross is neither independent nor disinterested. Any demand upon Defendant Ross is futile and, thus, excused.

**Defendants Capasse and Ross**

89.    Defendants Capasse and Ross are not independent or disinterested in light of their longstanding business and personal relationships with each other. Indeed, Defendants Capasse and

Ross are co-founders and managers of Waterfall, the Company's external manager and advisor. As such, having created a company together (which also manages Ready Capital), Defendants Capasse and Reese are irreconcilably conflicted and could not consider a demand to sue each other.

**Defendants Reese and Sinai**

90.     Defendants Reese and Sinai are also not independent from each other because both Defendants Reese and Sinai served on the board of directors of Sutherland Asset Management Corporation between November 2013 and October 2016. As such, Defendants Reese and Sinai have developed a longstanding business relationship and could not objectively consider a demand to sue one another.

**Defendants Mielle, Nathan and Reese**

91.     Defendants Mielle, Nathan and Reese served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

92.     Defendants Mielle, Nathan, and Reese breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Mielle, Nathan, and Reese face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

93.     In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

94.     Ready Capital has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Ready Capital any part of the damages Ready Capital suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

95.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

96.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e*., monies belonging to the stockholders of Ready Capital.  If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of Ready Capital, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

97.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Ready Capital to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

98.     Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four (4) of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

99.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

100.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

101.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

102.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

103.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

104.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

105.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

106.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

107.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

108.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

111.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and

(iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

112.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

115.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

116.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Individual Defendants for Aiding and Abetting)

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

119.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

120.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

121.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

122.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

123.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VI

### (Against the Individual Defendants for
### Violations of Section 10(b) of the Exchange Act)

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

126.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Ready Capital, their control over, and/or receipt and/or modification of Ready Capital's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ready Capital, participated in the fraudulent scheme alleged herein.

127.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.

The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

128.    The Individual Defendants were each members of Ready Capital's Board of Directors and senior management team during the aforesaid time period.  Based on their roles at Ready Capital, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

129.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Ready Capital, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

130.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

131.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)

made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

132.   As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and are thus liable for any harm caused to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, aiding and abetting, and violations of Section 10(b) of the Exchange Act;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 9, 2025

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*
Gregory M. Egleston
Thomas J. McKenna
Christopher M. Brain
260 Madison Avenue, 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com
Email: cbrain@gme-law.com

***Attorneys for Plaintiff***

# Verification

I, LUC VANCAMPENHOUT, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Ready Capital Corporation and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Ready Capital Corporation common stock at all relevant times.

_____
LUC VANCAMPENHOUT